# EXHIBIT B

Electronically Filed
4/10/2024 12:10 PM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Dharyan Cox, Deputy Clerk

Evan S. Mortimer, ISB# 9758
**LITSTER FROST INJURY LAWYERS**
**3501 W. Elder Street, Suite 208**
**Boise, Idaho 83705**
**Telephone: (208) 489-6400**
**Fax: (208) 489-6404**
**evan.mortimer@litsterfrost.com**

*Attorneys for Plaintiff*

**George E. McLaughlin, Colorado Bar # 16364**
*Pro Hac Vice* **Admission to be Requested**
**McLaughlin Law Firm, PC**
**1890 Gaylord Street**
**Denver, Colorado 80206-1211**
**Telephone (720) 420-9800**
**Facsimile (303) 322-3423**
**gem@w-mlawgroup.com**

*Attorneys for Plaintiff*

# IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

# OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| **BRANDON W. SCHAAPMAN,** an individual, <br><br> Plaintiff, <br><br> v. <br><br> **WRIGHT MEDICAL TECHNOLOGY, INC.,** a Delaware corporation; and, **MICROPORT ORTHOPEDICS INC.,** a Delaware corporation, <br><br> Defendants. | Case No. CV01-24-06207 <br><br> **COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND** |

COMES NOW Plaintiff, Brandon W. Schaapman, and hereby files this Complaint for

Damages and Jury Trial Demand against Defendants WRIGHT MEDICAL TECHNOLOGY,

INC., a Delaware corporation, and MICROPORT ORTHOPEDICS INC., a Delaware corporation,

respectfully stating to the Court the following:

## NATURE OF ACTION

1.     Plaintiff, Brandon W. Schaapman, brings this action for his personal injuries and

damages relating to the Defendants' development, design testing, assembling, manufacture,

packaging, labeling, marketing, distribution, supplying, and/or sale to him in the State of Idaho a

defective artificial hip product known as the "Profemur Plus CoCr Modular Neck" and the

"Profemur Hip System".

## THE PARTIES

2.     At relevant times hereto, Plaintiff, Brandon W. Schaapman, was and is a resident

and citizen of the State of Idaho, residing in Boise, Idaho.

3.     At all relevant times hereto Defendant Wright Medical Technology, Inc., referred

to herein at times as "Wright Medical," is a Delaware corporation, with its principal place of

business at 1023 Cherry Road, Memphis, Tennessee 38117.

4.     Defendant Wright Medical Technology, Inc., is registered to do business in the state

of Idaho and has designated as its Commercial Registered Agent C T Corporation System, 1555

W. Shoreline Dr., Suite 100, Boise, ID 83702.

5.     Defendant Wright Medical Technology, Inc., at times relevant hereto, was engaged

in the business of designing, manufacturing, distributing, selling, marketing and/or introducing

into interstate commerce, either directly or indirectly through third-parties or related entities,

various prosthetic orthopedic products, including the Wright Medical Profemur® hip products that

are in issue in this civil action.

6.      Defendant MicroPort Orthopedics Inc. is a Delaware corporation with its principal place of business at 5677 Airline Road, Arlington, Tennessee, 38002, and as such is a citizen of the State of Delaware and is a citizen of the State of Tennessee.

7.      Defendant MicroPort Orthopedics Inc. is registered to do business in the State of Idaho and has designated as its Commercial Registered Agent C T Corporation System, 1555 W. Shoreline Dr., Suite 100, Boise, ID 83702.

8.      On or about January 9, 2014, Defendant MicroPort Orthopedics Inc., purchased the hip and knee division of Wright Medical Technology, Inc., including its existing inventory or manufactured, but not yet sold, Profemur Plus CoCr Modular neck devices.

9.      Defendant MicroPort Orthopedics Inc., at times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur® hip products that are in issue in this civil action.

10.     Defendant MicroPort Orthopedics Inc., at times relevant hereto, was responsible for conducting post-market surveillance, monitoring, reporting adverse events, and response to post-market surveillance issues, related to the Wright Medical Profemur® Plus CoCr modular necks with reference numbers that began with "PHAC".

## JURISDICTION and VENUE

11.     This Court has jurisdiction over this matter pursuant to Idaho Code § 1-705 as the Defendants are foreign corporations registered to do business in the State of Idaho, the Plaintiff resides in Ada County, Idaho, and the jurisdictional amount established for filing this action is satisfied.

12.    Venue is appropriate in this Court pursuant to Idaho Code § 5-404 as the Defendants are foreign corporations registered to do business in the State of Idaho and the Plaintiff resides in Ada County, Idaho.

## FACTUAL ALLEGATIONS

## IDAHO PRODUCT LIABILIY

13.    This action is brought, in part, pursuant to the Idaho Products Liability Reform Act [IPLRA], Idaho Code § 6-1401, *et seq.*

14.    Defendant Wright Medical is a "Product Seller" as that term is defined by the IPLRA, Idaho Code § 6-1402 (1).

15.    Defendant Wright Medical is a "Manufacturer" as that term is defined by the IPLRA, Idaho Code § 6-1402 (2).

16.    The Profemur Plus CoCr Modular Neck that is the subject of this civil action is a "Product" as that term is defined by the IPLRA, Idaho Code § 6-1402 (3).

17.    The Safe Useful Life of the Profemur Plus CoCr Modular Neck that is the subject of this civil action, as the term "Safe Useful Life" is defined by the IPLRA, Idaho Code § 6-1403, was not less than ten (10) years.

## PLAINTIFF BRANDON W. SCHAAPMAN'S PROFEMUR HIP

18.    On January 9, 2012, Plaintiff Brandon W. Schaapman had a Profemur artificial hip implanted in his left hip in a procedure known as a total hip arthroplasty (THA).

19.    Roman Schwartzman, M.D., was the orthopedic surgeon who implanted Plaintiff's Wright Medical artificial hip.

20.    Plaintiff's January 9, 2012, hip implant surgery was performed at Saint Alphonsus Regional Medical Center, in Boise, Idaho.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 4

21.    Roman Schwartzman, M.D., did not violate any generally accepted standards of care in the field of orthopedic surgery in his care and treatment of Plaintiff in any of the following respects:

    a.    In the care or treatment that he provided to Plaintiff prior to beginning the hip implant surgery;

    b.    In the information that he did or did not provide Plaintiff prior to beginning the hip implant surgery;

    c.    In the selection of the Wright Medical CoCr Profemur® modular neck, or any other Wright Medical artificial hip devices, that were implanted in Plaintiff;

    d.    In the hip implant surgery he performed on Plaintiff;

    e.    In the care or treatment that he provided to Plaintiff, subsequent to Plaintiff's hip implant surgery; and,

    f.    In the information that he did or did not provide to Plaintiff subsequent to Plaintiff's hip implant surgery.

22.    Based upon the patient population in which Defendant Wright Medical intended their Profemur®, Conserve® and Dynasty® artificial hip devices to be implanted, at the time of implantation with his Profemur®, Conserve® and Dynasty® hip devices, Plaintiff Brandon W. Schaapman was an appropriate patient to be implanted with the Profemur® hip devices he received.

23.    Roman Schwartzman, M.D., recommended the Profemur®, Conserve® and Dynasty® hip devices to Plaintiff and indicated that the Profemur®, Conserve® and Dynasty® hip devices were appropriate for him.

24.    Brandon W. Schaapman reasonably relied upon Roman Schwartzman, M.D., in deciding to proceed with hip replacement surgery and have Profemur®, Conserve® and Dynasty® hip devices implanted in him.

25.    "Patient Testimonials" and "Patient Stories" published on various Wright Medical website pages prior to January 9, 2012, promoting Defendant Wright Medical's hip products, illustrate and demonstrate the patient population, and activity levels, that Defendant Wright Medical intended and expected for their Profemur®, Conserve® and Dynasty® hip devices.

26.    Before the Plaintiff's January 9, 2012, surgery, Defendant Wright Medical supplied the Profemur®, Conserve® and Dynasty® hip devices that were implanted in Plaintiff to Saint Alphonsus Regional Medical Center.

27.    In his total hip replacement surgery on January 9, 2012, Plaintiff Brandon W. Schaapman had implanted in his right hip the following specific Wright Medical artificial hip devices:

     a.    Dynasty® Biofoam Shell
        56 mm; Group F
        REF: DSBF-GF56
        LOT: 0711380787

     b.    Cancellous Self-Tapping Bone Screw
        6.5 mm
        REF: 1808-0302
        LOT: 0611379070

     c.    Dynasty® A-Class Poly Acetabular Liner
        40 mm
        REF: DLXP-GF40
        LOT: 1400826

     d.    Conserve® Total BCH Femoral Head
        40 mm
        REF: 38CH-4000
        LOT: 1329919

e.   Profemur® Plus Modular Neck
     REF: PHAC-1202
     LOT: 1396312 [Possibly 1596312]
     Short Straight
     Material: CoCr

f.   Conserve® Total Neck Sleeve
     REF: 38NS-0000
     LOT: 0511358256

g.   Profemur® Plasma Z Femoral Stem
     Size 4
     REF: PHA0-0266
     LOT: 0711375066

28.    An exemplar of an assembled Profemur® Plasma Z Stem (Size 4), a Profemur® Plus

CoCr Modular Neck (PHAC-1202), and a Conserve® Total BCH Femoral Head (40mm) are

depicted in Image 1, below.



Image 1

29.    The Profemur®, Conserve®, and Dynasty® hip devices described above and

implanted in Plaintiff in his surgery on January 9, 2012, were designed and manufactured by

Defendant Wright Medical Technology.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 7

30.     The Profemur®, Conserve®, and Dynasty® hip devices described above and implanted in Plaintiff in his surgery on January 9, 2012, were distributed by Defendant Wright Medical.

31.     The Profemur®, Conserve®, and Dynasty® hip devices described above and implanted in Plaintiff in his surgery on January 9, 2012, were sold by Defendant Wright Medical.

32.     Based upon the patient population that Defendants intended their Profemur®, Conserve®, and Dynasty® hip devices to be implanted in, and when Plaintiff Brandon W. Schaapman had these devices implanted in him, he was an appropriate patient to be implanted with these Profemur®, Conserve®, and Dynasty® hip devices.

33.     Subsequent to the date of implantation of his artificial hip, Plaintiff used his Wright Medical artificial hip in a normal and reasonably expected manner.

34.     Subsequent to the date of implantation of his artificial hip, Plaintiff used his artificial hip in a manner consistent with what was expected in the patient population these devices were intended for.

35.     Subsequent to the date of implantation of his artificial hip, Plaintiff used his artificial hip in a manner consistent with many of the representations made in "Patient Testimonials" and "Patient Stories" that appeared in Defendant Wright Medical's websites.

36.     After initial recovery from his January 9, 2012, surgery, for a period of time Plaintiff's artificial hip performed as expected, and the pain and disability Plaintiff had experienced in his right hip prior to his January 9, 2012, surgery had been substantially relieved.

37.     On or about January 9, 2014, Defendant MicroPort Orthopedics Inc., purchased the hip and knee division of Wright Medical Technology, Inc., including its existing inventory or manufactured, but not yet sold, Profemur Plus CoCr Modular neck devices.

38.    Disassociation of Dynasty® A-Class Poly Acetabular Liners from the Dynasty®
Biofoam Shells was a known occurrence with these products.

39.    There were other issues with the Dynasty® Biofoam Shells, 56 mm, Group F, that
were known to potentially lead to complications that may necessitate a revision surgery.

40.    In fact, on February 14, 2012, a Class 2 Device Recall of Dynasty® Biofoam Shells,
56 mm, Group F, by Wright Medical was posted on the Food and Drug Administration's ("FDA")
website, Recall ID 60947.

41.    The stated Manufacturer Reason for Recall was:

> The possibility exists that particulate debris from the packaging spacer
> could be unintentionally implanted into a patient and could potentially lead
> to complications that might necessitate a revision surgery.

42.    That Recall included 56 mm, Group F Dynasty® Biofoam Shells from Lot Number
0711380787, which is the lot that Plaintiff's 56 mm, Group F, Dynasty® Biofoam Shell came from.

43.    Unfortunately, that Recall came too late for Plaintiff as he had already been
implanted with that device just one month prior to the Recall.

44.    More unfortunate for Plaintiff, in 2015 he suffered a disassociation of the Dynasty®
A-Class Poly Acetabular Liner from his Dynasty® Biofoam Shell, necessitating the need for a
revision surgery, as had been warned of in the Recall.  [Image 2]



Image 2

45.    Due to failure of the acetabular component and liner disassociation, on February 9, 2015, Plaintiff had "revision" surgery performed on his right hip by Roman Schwartzman, M.D., at Saint Alphonsus Regional Medical Center, in Boise, Idaho.

46.    The devices implanted by Dr. Schwartzman in the February 9, 2015, revision surgery included the following Wright Medical devices:

    a.  Dynasty® Biofoam Shell
        60 mm; Ti; Group G
        REF: DSBF-GG60
        LOT: 02112566501550251

    b.  Dynasty® A-Class Poly Acetabular Liner STD
        42 mm Group G
        REF: DLXP-GG42
        LOT: 1567741

    c.  Conserve® Total BCH Femoral Head
        42 mm
        REF: 38CH-4200
        LOT: 1589747

    d.  Profemur® Plus Modular Neck
        REF: PHAC-1224
        LOT: 1549802
        Long AA/VV
        Material: CoCr

47.    In the February 9, 2015, revision surgery the Profemur® Plus Modular Neck, REF No. PHAC-1202, that had originally been implanted in the Plaintiff, was removed and replaced with a Profemur® Plus Modular Neck, REF No. PHAC-1224.

48.    The PHAC-1202 was a short straight modular neck, while the PHAC-1224 is a long varus/Valgus modular neck. [Image 3]



Image 3

49.    The Profemur® Plus Modular Neck, REF No. PHAC-1224 Plaintiff received in his February 9, 2015, revision surgery, was designed by Defendant Wright Medical.

50.    The Profemur® Plus Modular Neck, REF No. PHAC-1224 Plaintiff received in his February 9, 2015, revision surgery, was manufactured by Defendant Wright Medical.

51.    The Profemur® Plus Modular Neck, REF No. PHAC-1224 Plaintiff received in his February 9, 2015, revision surgery, was distributed by Defendant MicroPort.

52.    The Profemur® Plus Modular Neck, REF No. PHAC-1224 Plaintiff received in his February 9, 2015, revision surgery, was sold by Defendant MicroPort.

53.    In the course of the February 9, 2015, revision surgery the Profemur® Plasma Z Femoral Stem which had been implanted in the original [index] THA in 2012 was found to be well fixed and left in place.

54.    While some patients who experienced the Disassociation of their Dynasty® A-Class Poly Acetabular Liners from the Dynasty® Biofoam Shells have brought claims against Wright Medical, claiming the disassociation was a result of a product defect, Plaintiff here did not bring such a claim.

55.    Subsequent to the February 9, 2015, revision surgery Plaintiff used his Wright Medical artificial hip in a normal and reasonably expected manner.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 11

56.     Subsequent to the February 9, 2015, revision surgery Plaintiff used his artificial hip in a manner consistent with what was expected in the patient population these devices were intended for.

57.     After initial recovery from his February 9, 2015, revision surgery, Plaintiff's artificial hip performed as expected, until November 29, 2022.

58.     On the date of November 29, 2022, approximately seven years and ten months after his February 9, 2015, revision surgery, Plaintiff Brandon W. Schaapman, suddenly began to experience significant pain in his right hip.

59.     X-rays of Plaintiff's right hip taken on November 29, 2022, showed a fracture of the Profemur® Plus CoCr modular neck component of his artificial hip.  [Image 4]



Image 4

60.     On December 2, 2022, Taylor R. Lara, M.D., performed a revision surgery on Plaintiff's right hip at Saint Alphonsus Regional Medical Center, Boise, Idaho.

61.     Upon information and belief, a representative of MicroPort, or its local distributor of MicroPort hip devices, was notified and present for the December 2, 2022, revision surgery.

62.     In the course of the December 2, 2022, revision surgery Dr. Lara found:

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 12

    a.   The Profemur® Plus CoCr modular neck that had been implanted on February 9, 2015, had fractured;

    b.   The proximal part of that fractured modular neck was connected to the Conserve® Total BCH Femoral Head

    c.   The distal part of the fractured modular neck was imbedded in the Profemur® Plasma Z Femoral Stem;

    d.   The Profemur® Plasma Z Femoral Stem was well fixed; and,

    e.   The Acetabular component, the "cup" was well fixed.

63.    The operative note of Dr. Lara for the December 2, 2022, revision surgery reports, "Despite extensive work from the superior approach to the implant, the femoral implant remained well fixed and could not be removed using a vice grips."

64.    The operative note of Dr. Lara for the December 2, 2022, revision surgery further reports, "No threaded extraction bolt was available because it was blocked by the broken portion of the modular femoral neck which remained cold welded into the main portion of the femoral stem. Therefore, the decision was made to proceed with an extended trochanteric osteotomy," to remove and replace the fractured PHAC-1224 Profemur® Plus CoCr modular neck, which had been implanted on February 9, 2015, and the Profemur® Plasma Z Femoral Stem that had been implanted on January 9, 2012.

65.    Plaintiff Brandon W. Schaapman's December 2, 2022, revision surgery included:

    a.   Removal of the femoral head with the fractured proximal remnant of the Profemur Plus CoCr modular neck attached;

    b.   Performing an extended trochanteric osteotomy to remove the otherwise well fixed Profemur Plasma Z Stem and the embedded

fractured distal remnant of the Profemur Plus CoCr modular neck;

c. The removal and replacement of the polyethylene liner of the cup;

d. Implantation of a Smith and Nephew femoral stem;

e. Implantation of a Smith and Nephew femoral head; and,

f. Implantation of a MicroPort 28 mm inner diameter, 46 mm outer diameter, dual mobility polyethylene liner.

66.    Because of the extended trochanteric osteotomy Cerclage cables were needed to wire the femoral bone together, and remain in place.  [Image 5]



Image 5

67.    With the exception of the fact that the Profemur® Plus Modular neck had fractured, Plaintiff's right hip was not in need of revision surgery on December 2, 2022.

68.    With the exception of the fact that the Profemur Plus Modular Neck component of Plaintiff's artificial hip had fractured on November 29, 2022, at the time of Plaintiff's December 2, 2022 revision surgery each of the other artificial hip devices implanted in the Plaintiff's right

hip were in substantially the same condition in all relevant respects as when they had left the control of Defendants.

69.    Upon information and belief, the MicroPort representative who was present at the surgery did not request that they be permitted to take possession of the explanted failed Profemur hip devices for return to MicroPort for inspection and/or FDA MedWatch reporting purposes.

70.    Taylor R. Lara, M.D., did not violate any generally accepted standards of care in the field of orthopedic surgery in his care and treatment of Plaintiff in any of the following respects:

a.  In the care or treatment that he provided to Plaintiff prior to beginning the hip revision surgery;

b.  In the information that he did or did not provide Plaintiff prior to beginning the hip revision surgery;

c.  In the decision to remove any of the hip devices that were removed in the hip revision surgery;

d.  In the decision not to remove the hip devices that were not removed in the hip revision surgery;

e.  In the hip revision surgery he performed on Plaintiff;

f.  In the care or treatment that he provided to Plaintiff, subsequent to Plaintiff's hip revision surgery; and,

g.  In the information that he did or did not provide to Plaintiff subsequent to Plaintiff's hip implant surgery.

## ACCRUAL OF PLAINTIFF'S CAUSES OF ACTION

71.    Prior to November 29, 2022, Plaintiff had neither knowledge nor notice that he in fact had in his body the recalled Profemur® Plus Modular Neck.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 15

72.     Prior to November 29, 2022, Plaintiff had neither knowledge nor notice that there was any defect in the design, manufacture or labeling of his implanted Profemur® Plus CoCr Modular Neck.

73.     Prior to November 29, 2022, Plaintiff had neither knowledge nor notice that there was any defect in the design, manufacture or labeling of his implanted Profemur® Plus CoCr Modular Neck.

74.     Prior to November 29, 2022, Plaintiff's implanted Profemur® Plus CoCr Modular Neck had not failed.

75.     Prior to November 29, 2022, Plaintiff had not suffered any injury caused by his implanted Profemur® Plus CoCr Modular Neck.

76.     Plaintiff's causes of action alleged in this Complaint therefore did not accrue until November 29, 2022.

## WRIGHT MEDICAL, MICROPORT, and the PROFEMUR® HIP

77.     In approximately the year 1985 a European manufacturer of artificial hip devices, known as Cremascoli Ortho Group ("Cremascoli"), developed the first prototype of what became known as the titanium Profemur® Modular Necks.

78.     The first prototype of what became known as the titanium Profemur® Modular Necks was patented with the European Patent Office by Cremascoli in 1986.

79.     What became known as the titanium Profemur® Modular Necks were first distributed in Europe by Cremascoli in 1986.

80.     The name PROFEMUR® was originated by Cremascoli as a brand name for certain models or designs of its artificial hip devices.

81.     Cermascoli PROFEMUR® prosthetic hip devices are the subject of medical literature published in 1996. [See: The Modular Prosthesis for Hip Revision Surgery: Experience with the Profemur Stem: Masse, Scagnelli, Trossarello, Buratti, Randelli, Basso, Dei Poli, Giaretta, Leonardi, Massetti, Pugliese: Italian Journal of Orthopaedics and Traumatology-Suppl. 1, Vol XXII. - Fasc. 2- GIUGNO 1996.]

82.     The above referenced 1996 medical literature is cited by Wright Medical in various Wright Medical Profemur® Technical Monographs that it created and distributed. [e.g., PROFEMUR™ TOTAL HIP SYSTEM, PERFORMANCE CHARACTERISTICS OF THE PROFEMUR™ TOTAL HIP SYSTEM, ©2002 Wright Medical Technology, Inc., MH688-102; and, PROFEMUR® R Revision Hip System, TECHNICAL MONOGRAPH, ©2010 Wright Medical Technology, MH688-102, Rev. 6.10.]

83.     In December 1999, Defendant Wright Medical Group, Inc., purchased Cremascoli Ortho, acquiring Cremascoli's Profemur® artificial hip product line, related documents, and manufacturing facilities in Toulon, France.

84.     Based on publicly available patent documents of Cremascoli, it appears that there was a change in the design of the titanium Profemur® modular necks before these products were first distributed in the United States. [Hereinafter at times referred to as a "re-design".]

85.     Upon information and belief, before the acquisition of Cremascoli by Wright Medical, a re-design of the Profemur® Modular Necks at the mid-body of the neck increased the range of motion of the hip joint in an assembled artificial hip device when used with compatible femoral heads and acetabular components. [Hereinafter these re-designed Profemur® Modular Necks at times are referred to as the "PHA0" modular necks.]

86.    "Version" is the term Wright Medical used for the different lengths and angles of its Profemur® Modular Necks, identified by unique catalog numbers. For example, the Wright Medical Profemur® titanium varus/valgus 8° long neck, catalog # PHA0-1254, was one "version" of a Wright Medical Profemur® Modular Neck.

87.    By the end of the year 1998, the Cremascoli modular neck product line had been expanded to include additional "versions" of modular necks that did not exist in 1986.

88.    After the acquisition of Cremascoli, Wright Medical expanded the Profemur product line to include additional designs and "versions" of Profemur® Modular Necks that did not exist prior to its acquisition of Cremascoli.

89.    Sometime after the acquisition of Cremascoli, Wright Medical began to refer to some of its artificial hip devices and products as the "Profemur® Total Hip System."

90.    On September 26, 2000, Wright Medical Technology, Inc. notified the United States Food and Drug Administration [FDA] of its intent to market what it called the "PRO-FEMUR R Revision Hip System" by way of what is known as an Abbreviated 510(k) Premarket Notification. [See: FDA 510(k) K003016.]

91.    Wright Medical's Abbreviated 510(k) Premarket Notification for the PRO-FEMUR R Revision Hip System Device Description included, "twelve modular necks which are available in six versions and two lengths: Neutral, anteversion/retroversion 8° or 15°, varus/valgus 8°, or combination of anteverted/retroverted – varus/valgus (in both short and long lengths)."

92.    On December 13, 2000, Wright Medical Technology, Inc. received clearance from the FDA to market the PRO-FEMUR R Revision Hip System in the United States.

93.    The FDA itself did not test the safety or efficacy of the Profemur® R Revision Hip System stem, nor the accompanying titanium Profemur® modular necks, as a part of the Abbreviated 510(k) process.

94.    Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to manufacture, label, market, promote, distribute, and sell in the United States the Wright Medical Profemur® Total Hip System and its components.

95.    Sometime after December 13, 2000, Defendant Wright Medical Technology, Inc., began to manufacture, label, market, promote, distribute, and sell in the United States Wright Medical titanium Profemur® Modular Necks.

96.    On March 11, 2002, Wright Medical Technology, Inc. filed an application with the United States Patent and Trademark Office to register the trademark "PROFEMUR" in the United States. [See: U.S. Trademark Registration Number: 76380670.]

97.    After receiving the 510(k) clearance to market the PRO-FEMUR® R Revision Hip System, over time Wright Medical expanded the Profemur® prosthetic hip stem product line to include additional designs of Profemur® Stems, including hip stems branded with names such as the Profemur® Z Hip Stem, Profemur® Plasma Z Hip Stem, Profemur® LX Hip Stem, and the Profemur® TL Hip Stem, among others.

98.    Sometime after January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, in printed brochures that it created, copywrote, and distributed, known as "Technical Monographs".

99.    Sometime after January 13, 2000, Defendant Wright Medical began to describe its Profemur® hip devices to its distributors, sales representatives, and surgeons, on and through internet website pages that it created, copywrote, and controlled.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 19

100.    Sometime after January 13, 2000, Defendant Wright Medical began to promote and market its Profemur® hip devices to the general public, on and through internet website pages that it created, copywrote, and controlled.

101.    In various technical monographs material created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck used with the Profemur® Hip has been employed by Wright Cremascoli for over 15 years.  The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur® Hip.  None of the necks has experienced a clinical failure since their inception.

[e.g., Wright Medical Technical Monograph MH688-102 ©2002, and ©2004.]

102.    Wright Medical knew that the above quoted statement by Wright Medical that, "None of the necks has experienced a clinical failure since their inception," was false when first made.

103.    Prior to December 1, 2008, Wright Medical never corrected, retracted, or recanted the above quoted statement by Wright Medical that "None of the necks has experienced a clinical failure since their inception."

104.    Wright Medical never distributed in the United States any modular necks that were the original European patented design of the Profemur modular neck first distributed in Europe.

105.    Wright Medical never distributed in the United States any of the modular necks that were, "designed in 1985", and which it stated in its Technical Monograph MH688-102 © 2002 had been "employed by Wright Cremascoli for over 15 years".

106.    In various Technical Monographs created, copywritten, and distributed by Wright Medical beginning in approximately the year 2002, and continuing into the year 2005, Wright Medical made the following representations, statements, and claims about its Profemur® modular necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent # 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty. Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion

[e.g., Wright Medical Technical Monograph MH688-102 ©2002, and ©2004.]

107.    The above quoted statement by Wright Medical that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks was false at the time it was first made.

108.    Wright Medical has never corrected, retracted, or recanted the above quoted statement that it, "guaranteed . . . absence of fretting corrosion," with its Profemur® modular necks.

109.    In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients, and the general public, Wright Medical made representations, statements, and claims about its Profemur®, Conserve®, and Dynasty® hip devices and products that these products were intended for patients who wanted to return to an "active lifestyle."

110.    In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Profemur®, Conserve®, and Dynasty® hip devices and products that these products were intended for patients who wanted to return to and engage in various sporting, athletic, and

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 21

lifestyle activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, and heavy labor.

111.    In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Profemur®, Conserve®, and Dynasty® hip devices and products that these products had been implanted in patients who had returned to or engaged in various sporting, athletic, and lifestyle activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, and heavy labor.

112.    In various marketing and informational material published and distributed by Wright Medical, and available to Wright Medical's sales representatives and distributors, surgeons, patients, and the general public, Wright Medical made representations, statements, and claims about its Profemur®, Conserve®, and Dynasty® hip devices and products that these products were expected to last 10 to 15 years.

113.    In marketing its Profemur®, Conserve®, and Dynasty® hip devices and products to surgeons, one or more Wright Medical sales representatives made representations to one or more surgeons that Wright Medical Profemur®, Conserve®, and Dynasty® hip devices hip products were expected to last at least 20 years.

114.    The modular necks which Wright Medical represented in literature it created and distributed in the United States for its first marketing of these devices as having been "designed by Cremascoli in 1985," and "successfully implanted in over 50,000 patients," included the original modular neck design that existed prior to the re-designed [PHA0] necks.

115.    Prior to the year 2000, Cremascoli had received notice of clinical failures in the form of fractures of its (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

116.    Prior to the year 2000, Wright Medical had received notice of clinical failures in the form of fractures in Europe of the (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

117.    Once Wright Medical filed a 510(k) Premarket Notification application to distribute its Profemur® modular necks in the United States, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

118.    Once Wright Medical received clearance to distribute titanium Profemur® modular necks in the United States as a result of its 510(k) Premarket Notification application, Wright Medical had a duty to report to the FDA any, each, and all events it received notice of where it was claimed that there had been a fracture in a patient of a Profemur® modular neck.

119.    Prior to January of 2005, Wright Medical knew of or received notice of fractures in patients of Profemur® modular necks that had been "designed by Cremascoli in 1985".

120.    Prior to April 19, 2005, Wright Medical did not report to the FDA any of the events it received notice of that a Profemur® modular neck had fractured in a patient.

121.    On or about April 19, 2005, Wright Medical first reported to the FDA that it had received notice that a Profemur® modular neck implanted in a patient had fractured.

122.    After receiving notice of a 2005 Profemur® modular neck fracture, Wright Medical received notice of additional Profemur® modular neck fractures in patients.

123.    The number of reported titanium Profemur® modular neck fractures has continued to increase, and to date more than 1000 Profemur modular neck fractures have been reported. [See: FDA MAUDE database.]

124.    Prior to December 1, 2008, Wright Medical did not inform all orthopedic surgeons in the United States known by it to have implanted its titanium Profemur® modular necks of the reports it had received of titanium modular necks fracturing.

125.    On December 1, 2008, a "Safety Alert" was sent by Wright Medical to certain "medical professionals," which stated, in part, "[W]e have received reports of 35 modular neck failures as of November 21, 2008. Initial investigations have revealed several commonalities in these failures: heavyweight males, long modular necks and patient activities such as heavy lifting and impact sports."

126.    At the time Wright sent its December 1, 2008 Safety Alert, Wright Medical in fact was aware of more than 35 titanium modular neck failures (by fracture of a Profemur® modular neck) as of November 21, 2008, if all of the reported Wright and Cremascoli modular neck fractures back to the year 1985 were counted.

127.    In the FDA Guidance Documents for Femoral Stem Prostheses DRAFT, dated August 1, 1995, available to industry at the time Wright Medical submitted its Abbreviated 510(k) clearance application for the Pro-Femur R Revision Hip System, the section titled "Contraindicated Weight Limit(s)", stated, in part, "labeling by contraindication as not for use in patients above a certain weight."

128.    In Wright Medical's Instructions for Use [hereinafter "IFU"] that accompanied the Profemur® hip devices distributed in the United States from the date of their introduction into the

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 24

United States, through June of 2009, Wright stated the use of these devices to be contraindicated in "obese" patients, "[W]here obesity is defined as three times normal body weight."]

129.     Prior to August 2010, Wright Medical did not, in its IFUs for the Profemur® hip devices distributed in the United States, include a warning, precaution or other advisory as to the use of any of its Profemur® modular necks in people who weighed more than a specifically stated patient body weight.

130.     Wright Medical has never stated in its IFUs for the Profemur® hip devices distributed in the United States that the use of any of its Profemur® modular necks was contraindicated in heavyweight males.

131.     Wright Medical has never stated in its IFUs for the Profemur® devices distributed in the United States that the use of any of its Profemur® modular necks was contraindicated in patients who engaged in heavy lifting.

132.     Wright Medical has never stated in its IFUs for the Profemur® devices distributed in the United States that the use of any of its modular necks was contraindicated in patients who engaged in impact sports.

133.     The IFU for Wright Medical Profemur® devices distributed in the United States was the same IFU document used for some other Wright Medical hip devices that did not use Profemur® Modular necks and were not modular at the region of the artificial femoral neck.

134.     At no time did Wright Medical state in its IFUs distributed in the United States that the rate of failure by fracture of the implant was higher for its Profemur® modular neck hip devices, compared to the rate of failure by fracture for other Wright Medical hip devices that did not use modular necks, but were subject to the same IFU document.

135.    Even though some Wright Medical IFUs for the Profemur® devices in use prior to August 2010 contained a section titled, "Conditions presenting increased risk of failure include. . . ," that section of the IFU did not state that patients who weigh more than a certain patient body weight, or have a BMI at or above a certain number, or engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component, when compared to the risk of failure for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

136.    Even though some Wright IFUs for the Profemur® devices in use prior to August 2010 contained a section titled "Warning," and a subsection within titled "Modular Necks," Wright Medical did not state therein that patients weighing more than a certain patient body weight, or with a BMI at or above a certain number, or who engage in a high level of physical activity, or engage in heavy lifting, or engage in impact sports, would be at an increased risk of failure (by fracture) of the modular neck component when compared to the risk of failure (by fracture) for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

137.    Even though some Wright IFUs for the Profemur® hip devices in use prior to August 2010 contained a section titled "General Product Information," that stated, "An overweight or obese patient can produce high loads on the prostheses, which can lead to failure of the prosthesis," and, "If the patient is involved in an occupation or activity which includes substantial walking, running, lifting, or muscle strain, the resultant forces can cause failure of the fixation of the device, or both," Wright Medical did not state that patients involved in an occupation or activity that included those activities created any higher risk of failure (by fracture) than would exist in any other design of artificial hip stem without a modular neck, when compared to the risk of failure

for other Wright Medical hip devices using that same IFU document but that did not use modular necks.

138.    Wright Medical did not change the language in its IFUs for its Profemur® devices distributed in the United States discussing the issue of any specific patient body weight or activity levels as they may relate to modular neck fractures until August 2010, if not later.

139.    Between the dates of December 13, 2000 and August 25, 2009 all of the Profemur® modular necks distributed by Wright Medical were made of a titanium alloy, generally known as Ti6Al4V.

140.    After Profemur® Modular Necks began to be implanted, Cremascoli and Wright Medical began to receive reports of its Profemur® titanium modular necks having fractured (i.e., broken into two pieces).

141.    After Profemur® Modular Necks began to be implanted, Cremascoli and Wright Medical began to receive reports of its Profemur® titanium modular necks having fractured (i.e., broken into two pieces) at the oblong taper (distal end) where it is seated in the "pocket" of the Profemur® stem.

142.    At some point in time prior to July 30, 2010, Wright Medical came to the conclusion that higher than normal rates of early failure of the long offset Profemur® titanium modular necks have been observed for heavyweight (>230 lbs.) patients.

143.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, case studies appeared in medical journals reporting the fracture of Wright Medical titanium Profemur® modular necks.

144.    Wright Medical titanium Profemur® Modular Necks were fracturing at the neck-stem junction because they were:

a. Inadequately designed for the patient population for which they were marketed;

b. Not designed to withstand the stress and loads that they would reasonably be expected to be subjected to after implantation;

c. Not designed to meet the performance of applicable industry standards, particularly ISO 7206-6; and,

d. Not designed with the performance characteristics that had been represented to surgeons by Wright Medical, and its sales force.

145.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, surgeons who had been implanting these devices began to question the safety of these devices.

146.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, some surgeons who had been implanting these devices stopped using the Wright Medical titanium modular necks.

147.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical's sales of its Profemur® hip devices in the United States began to decline.

148.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not acknowledge that modular neck fractures were a result of defective design.

149.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical engaged in a campaign of concealment,

misinformation, deceit, and fraud, misrepresenting to surgeons the facts and truth as to the numbers, rates, and reasons for its Profemur® modular neck fractures.

150.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not inform all surgeons using these products that, based upon information that had been reported to the FDA MAUDE Database, using these devices that the long Profemur® Necks had higher numbers of fractures, and higher rate of fractures, than the short versions of the modular necks.

151.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical did not inform Plaintiff's surgeon that, based upon information that had been reported to the FDA MAUDE Database, using these devices that the long Profemur® Necks had higher numbers of fractures, and higher rate of fractures, than the short versions of the modular necks.

152.    As the number of reported Wright Medical titanium Profemur® modular neck fractures continued to increase, Wright Medical began to design and develop a Profemur® modular neck made of a cobalt-chrome alloy [CoCr].

153.    One of the purposes of Wright Medical designing and developing a Profemur® modular neck made of CoCr was to preserve its market share of the artificial hip device market.

154.    On or about April 16, 2009, Wright Medical submitted to the FDA an Abbreviated 510(k) premarket notification of intent to market what it called Profemur® Hip System Modular Necks.  [See: FDA 510(k) K091423.]

155.    The modular necks that were the subject of the April 16, 2009, premarket notification of intent to market were made of a CoCr alloy.

156.    The modular necks that were the subject of the April 16, 2009, premarket notification of intent to market eventually became known as the Profemur® Plus CoCr Modular Neck.

157.    In that premarket notification Wright Medical represented to the FDA, "The indication of the use of the PROFEMUR® Hip System Modular Necks are identical to the previously cleared predicate devices. The design features and materials of the subject devices are substantially equivalent to those of the predicate devices." [See: FDA 510(k) K091423.]

158.    The "predicate devices" referenced in the April 16, 2009 notification of intent to market were the titanium Profemur® titanium modular necks which had received clearance by way of the FDA letter dated December 13, 2003. [See: FDA 510(k) K003016.]

159.    The design, development, and introduction of Wright Medical Profemur® Plus CoCr Modular Necks was not done as a subsequent remedial measure for any design defect that existed in the Wright Medical titanium Profemur® modular necks.

160.    Prior to August 25, 2009 Wright Medical knew or should have known that the proposed Profemur® Plus CoCr Modular Necks would be subject to corrosion at the neck-stem junction.

161.    Prior to August 25, 2009 Wright Medical knew or should have known that the proposed Profemur® Plus CoCr Modular Necks would be subject to fracture at the neck-stem junction.

162.    Based upon what Wright Medical knew or should have known as of August 25, 2009, a reasonable manufacturer would not have marketed the Wright Medical Profemur® Plus CoCr modular necks.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 30

163.   On August 25, 2009, Wright Medical received clearance from the FDA to market, in the United States Profemur® modular necks manufactured from CoCr.  [See: FDA 510(k) K091423.]

164.   Sometime after the date of August 25, 2009, Wright Medical began to market, distribute, and sell in the United States Profemur® Modular Necks made of a cobalt-chrome alloy, called the Profemur® Plus CoCr Modular Neck.

165.   The Wright Medical Profemur® Plus CoCr Modular Necks were marketed to be an alternative for the Wright Medical titanium Profemur® Modular Necks, compatible with all of the same Wright Medical Profemur® stems and Wright Medical Conserve® femoral heads.

166.   Wright Medical does not admit that there was, or is, any defect in the design of its titanium Profemur® modular necks that leads to premature fracture of its titanium modular necks.

167.   Wright Medical does not admit that there was, or is, any defect in the manufacture of its titanium Profemur® modular necks that leads to premature fracture of its titanium modular necks.

168.   The Profemur® Plus CoCr Modular Necks that Wright Medical began to offer to surgeons and patients included both long and short versions of those modular necks.

169.   The Profemur® Plus CoCr Modular Necks that Wright Medical began to offer to surgeons and patients did not include a warning that the CoCr versions of the modular necks had a risk of micromotion, fretting corrosion, and fracture of the neck in the pocket of the stem while being used in the intended patient population.

170.   The Profemur® Plus CoCr Modular Necks that Wright Medical designed and manufactured were designed to be used with all of the same femoral heads and the same Profemur® hip stems as were its titanium Profemur® modular necks.

171.    In promoting its Profemur® Plus CoCr Modular Necks Wright Medical has stated, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks." [See Profemur® Plus CoCr Modular Necks Frequently Asked Questions, Wright Medical publication MH619-812.]

172.    The claim by Wright Medical in promoting its Profemur® Plus CoCr Modular Necks that, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks," was not supported by independent scientific testing.

173.    The claim by Wright Medical that "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® Plus CoCr Modular Necks" was false and misleading.

174.    In marketing its Profemur® Plus CoCr Modular Necks Wright Medical claimed that these CoCr modular necks would result in less fretting than occurred with titanium modular necks.

175.    Claims by Wright Medical that these Profemur® Plus CoCr Modular Necks would result in less fretting than occurred with titanium modular necks was not supported by independent scientific testing.

176.    Claims by Wright Medical that its Profemur® Plus CoCr Modular Necks would result in less fretting than occurred with titanium modular necks were false and misleading.

177.    The design of the Wright Medical Profemur® Plus CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur® hip stems, is such that it in fact promotes the process of fretting corrosion at the modular neck/stem junction.

178.    In promoting its Profemur® Plus CoCr Modular Necks Wright Medical claimed that the use of dissimilar metals, such as the mating of a CoCr modular neck with a titanium stem, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients.

179.    Claims by Wright Medical that the mating of a Profemur® Plus CoCr Modular Neck with a titanium stem would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were not supported by unbiased sound scientific testing.

180.    Claims by Wright Medical that the mating of its Profemur® Plus CoCr Modular Necks with its Profemur® titanium stems, would not result in galvanic corrosion ("battery effect") at a level that would be problematic for patients, were false and misleading.

181.    The design of the Wright Medical Profemur® Plus CoCr modular neck, when coupled with the design of the Wright Medical titanium Profemur® hip stems is such that it in fact promotes the process of galvanic corrosion ("battery effect") at the modular neck/stem junction.

182.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for fretting corrosion after implantation in patients.

183.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for galvanic corrosion ("battery effect") after implantation in patients.

184.    Prior to offering its Profemur® Plus CoCr Modular Necks for distribution or sale in the United States, Wright Medical did not adequately test its design of Profemur® Plus CoCr Modular Necks for galvanic corrosion ("battery effect") when mated with titanium Profemur® hip stems after implantation.

185.    Wright Medical took to market its Profemur® Plus CoCr Modular Necks without having adequately tested them for *in vivo* performance to resist fretting corrosion.

186.    Wright Medical took to market its Profemur® Plus CoCr Modular Necks without having adequately tested them for *in vivo* performance to resist galvanic corrosion.

187.    Wright Medical's motive in going to market with its Profemur® Plus CoCr Modular Necks to preserve market share and its profits from the sale of its Profemur® hip products.

188.    The neck-stem junctions of the Profemur® Plus CoCr Modular Necks coupled with a Profemur® titanium hip stem, are subject to significant micromovement which results in significant fretting corrosion, galvanic corrosion, metal ion release, and fracture.

189.    The neck-stem junctions of the Profemur® Plus CoCr Modular Neck, coupled with a Profemur® titanium hip stem, and the micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which lead to failure by fracture of the neck in the pocket of the stem and need for revision of the patient's hip.

190.    C. Lowry Barnes, M.D., is an orthopedic surgeon who had for a time been a paid consultant for Wright Medical.

191.    C. Lowry Barnes, M.D., was a named contributor to or author of various Profemur® Surgical Techniques brochures for Wright Medical.

192.    At the request of Wright Medical, C. Lowry Barnes, M.D., participated in the design and development of the Wright Medical Profemur® Plus CoCr Modular Necks.

193.    Prior to June 19, 2013, C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks were corroding after implantation in patients.

194.    Prior to June 19, 2013, C. Lowry Barnes, M.D., informed Wright Medical that its Profemur® Plus CoCr Modular Necks were corroding after implantation in patients, resulting in the need for revision surgery to remove and replace the patient's implanted Profemur® hip system.

195.    Wright Medical ignored the concerns of its paid consultant, C. Lowry Barnes, M.D., and continued to manufacture, distribute, and sell its Profemur® Plus CoCr Modular Necks for implantation in patients by orthopedic surgeons.

196.    Prior to June 19, 2013, Wright Medical had been informed that its Profemur® Plus CoCr Modular Necks would be subject to corrosion at the neck-stem junction.

197.    Prior to June 19, 2013 Wright Medical had been informed that its Profemur® Plus CoCr Modular Necks would be subject to fracture at the neck-stem junction.

198.    Prior to June 19, 2013, Wright Medical began to receive notice from surgeons that its Profemur® Plus CoCr Modular Necks were corroding, resulting in the need for revision surgery to remove and replace the patient's implanted Profemur® hip system.

199.    Prior to June 19, 2013, Wright Medical received notice that there had been a fracture of a Profemur® Plus CoCr Modular Neck.

200.    On June 19, 2013, Wright Medical Group, Inc., the parent corporation of Wright Medical Technology, Inc., announced a definitive agreement under which MicroPort Medical B.V., a subsidiary of MicroPort Scientific Corporation, would acquire Wright's OrthoRecon business, including hip implant products.

201.    Upon information and belief, product complaint data reported to Wright Medical prior to January 9, 2014, did indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems, as compared to traditional titanium necks.

202.    Upon information and belief, product complaint data reported to Wright Medical prior to January 9, 2014, did indicate an increased risk of adverse events due to galvanic corrosion ("battery effect"), as compared to traditional titanium necks when coupled with Wright Medical Profemur® hip stems.

203.    Prior to January 9, 2014, Wright Medical received notice that there had been fractures of Profemur® Plus CoCr Modular Necks.

204.    Wright Medical knew or should have known that as of the date of January 9, 2014:

    a.    It had not adequately tested its Profemur® Plus CoCr Modular Necks to simulate in vivo performance for resistance to fretting corrosion;

    b.    It had not adequately tested its Profemur® Plus CoCr Modular Necks to simulate in vivo performance for resistance to galvanic corrosion ("battery effect");

    c.    Its Profemur® Plus CoCr Modular Necks would be subject to fretting corrosion;

    d.    There was an increased risk of fretting corrosion at the neck-stem junction;

    e.    There was an increased risk of galvanic corrosion ("battery effect") at the neck-stem junction; and,

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 36

      f.   The oblong taper of Profemur® Plus CoCr modular necks were known

          to fracture in the pocket of the stem.

205.    Based upon what Wright Medical knew or should have known as of January 9, 2014, a reasonable manufacturer would have ceased the distribution of the Wright Medical Profemur® Plus CoCr long modular necks prior to that date.

206.    Based upon what Wright Medical knew or should have known as of January 9, 2014, Wright Medical should have ceased the distribution of the long Profemur® Plus CoCr Modular Necks prior to that date.

207.    Based upon what Wright Medical knew or should have known as of January 9, 2014, a reasonable manufacturer would have formally recalled the long Profemur® Plus CoCr Modular Necks prior to that date.

208.    Based upon what Wright Medical knew or should have known as of January 9, 2014, Wright Medical should have formally recalled the long Profemur® Plus CoCr Modular Necks prior to that date.

209.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date a reasonable manufacturer would have published information that its claims that product complaint data did not indicate an increased risk of adverse events due to taper junction fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

210.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date Wright Medical should have published information that its claims that product complaint data did not indicate an increased risk of adverse events due to taper junction

fretting and corrosion for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

211.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date a reasonable manufacturer would have published information that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

212.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date Wright Medical should have published information that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

213.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date a reasonable manufacturer would have informed orthopedic surgeons using its Profemur® hip products that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

214.    Based upon what Wright Medical knew or should have known as of January 9, 2014, prior to that date Wright Medical should have informed orthopedic surgeons using its Profemur® hip products that its claims that product complaint data did not indicate an increased risk of galvanic corrosion ("battery effect") for Wright Medical Profemur® Plus CoCr Modular

Necks when coupled with Wright Medical Profemur® hip stems had now been shown not to be true.

215.    The neck-stem junctions of the Profemur® CoCr modular neck, coupled with a Profemur® titanium hip stem, are subject to significant micromovement which result in significant fretting corrosion, galvanic corrosion, metal ion release, and fracture of the neck in the pocket of the stem.

216.    The neck-stem junctions of the Profemur® CoCr modular neck, coupled with a Profemur® titanium hip stem, and the micromovement which results in significant fretting corrosion, galvanic corrosion, and metal ion release, directly and proximately causes adverse medical conditions which lead to the failure, fracture of the neck, and need for revision of the hip.

217.    Based upon the facts and allegations set forth above, the Profemur® CoCr modular neck and Profemur® hip stem system are defective in their design in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Brandon W. Schaapman.

218.    Based upon the facts and allegations set forth above, the Profemur® CoCr modular neck and Profemur® hip stem system are more dangerous than would be expected by an ordinary person who may reasonably be expected to use it.

219.    Based upon the facts and allegations set forth above, the Profemur® CoCr modular neck and Profemur® hip stem system are defective in their manufacturing in that they do not comply with their intended design, specifications, in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 39

product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Brandon W. Schaapman.

220.    Based upon the facts and allegations set forth above, the Profemur® CoCr modular neck and Profemur® hip stem system are defective in their labeling in that they do not perform as represented, and the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Brandon W. Schaapman.

221.    Based upon the facts and allegations set forth above, the Profemur® Plus CoCr Modular Necks are unreasonably dangerous in that the risks that were inherent in this product being used for hip replacement, when weighed against the utility or benefit derived from the product, outweigh the benefit which might have been gained by placing this defective product in the body of Plaintiff Brandon W. Schaapman.

222.    Defendants Wright Medical Technology, Inc. and MicroPort were negligent in their design, manufacture, distribution and sale, marketing, promotion, and labeling of the Profemur® CoCr modular neck and the Profemur® hip stem system.

223.    Defendants Wright Medical Technology, Inc. and MicroPort were negligent in the failure to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to taper junction fretting and corrosion, and fractures of the neck.

224.    Defendants Wright Medical Technology, Inc. and MicroPort were negligent in the failure to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of adverse events due to galvanic corrosion ("battery effect").

225.    Defendant Wright Medical Technology, Inc. was negligent in their failure to cease distribution of the Wright Medical long Profemur® Plus CoCr modular necks before the date of January 9, 2014.

226.    Before January 9, 2014, Wright Medical began to receive notice that its long Profemur® Plus CoCr Modular Necks were fracturing at the neck-stem junction.

227.    On January 9, 2014, the Wright Medical OrthoRecon operating segment, was sold for approximately $285 million.

228.    In its form 10-Q, filed with the United States Securities and Exchange Commission, for the quarter ended March 31, 2014, Wright Medical Group, Inc., the parent corporation of Defendant Wright Medical Technology, Inc., states:

> On January 9, 2014, pursuant to the previously disclosed Asset Purchase Agreement, dated as of June 18, 2013 (the Purchase Agreement), by and among us, MicroPort Scientific Corporation, a corporation formed under the laws of the Cayman Islands (MicroPort), and MicroPort Medical B.V., a besloten vennootschap formed under the laws of the Netherlands, we completed our divesture and sale of our business operations operating under the OrthoRecon operating segment (the OrthoRecon Business) to MicroPort. Pursuant to the terms of the Asset Purchase Agreement, the purchase price (as defined in the Purchase Agreement) for the OrthoRecon Business was approximately $285 million (including an estimated working capital target adjustment), which MicroPort paid in cash.

229.    The sale by Wright Medical of its OrthoRecon operating segment to MicroPort included the Wright Medical Profemur® product line, and its manufacturing facilities in Arlington, Tennessee, including design and manufacturing documents, claim files, and postmarket surveillance documents for its Profemur hip products.

230.    Prior to the sale by Wright Medical of its OrthoRecon operating segment to MicroPort, Ted Davis was the President of the Wright Medical OrthoRecon operating segment.

231.     As President of the Wright Medical Wright Medical OrthoRecon operating segment, Ted Davis would have been privy to and knowledgeable about the reports Wright Medical was receiving of adverse clinical events associated with its Profemur Plus CoCr Modular necks.

232.     As President of the Wright Medical Wright Medical OrthoRecon operating segment, Ted Davis would have been privy to and knowledgeable about the reports Wright Medical was receiving that its Profemur® Plus CoCr Modular Necks were fracturing.

233.     Defendant MicroPort Orthopedics Inc., is the successor in interest to, or the United States operating subsidiary of, MicroPort Scientific Corporation and MicroPort Medical B.V., that had purchased the Wright Medical OrthoRecon operating segment.

234.     At the time of the sale of the Wright Medical OrthoRecon operating segment to MicroPort, Ted Davis became President of MicroPort Orthopedics Inc.

235.     At the time of the sale of the Wright Medical OrthoRecon operating segment to MicroPort, Ted Davis became Chief Executive Officer of MicroPort Orthopedics Inc.

236.     Since the date of January 9, 2014 MicroPort Orthopedics Inc., has had the obligation to conduct post-market surveillance related to the Profemur® hip product line.

237.     Under Section 522 of the Federal Food, Drug and Cosmetic Act (the Act), 21 U.S.C. § 360, and 21 CFR Part 822, MicroPort was obligated to conduct postmarket surveillance related to the Profemur® Plus CoCr Modular Necks, and the Profemur® Plasma Z Hip Stem, among other devices.

238.     As a result of its purchase of the Wright Medical OrthoRecon operating segment on January 9, 2014, MicroPort is legally liable for any design or manufacturing defects that may

exist in Wright Medical Profemur® Plus CoCr Modular Necks it distributed or sold on after that date, regardless of when those CoCr modular necks were manufactured.

239. Prior to purchasing the Wright Medical Hip and Knee division in January of 2014, MicroPort had learned that fractures of Wright Medical Profemur® Plus CoCr Modular Necks had been reported.

240. By the date of January 9, 2014, MicroPort knew that in June of 2013 the first fracture of a Wright Medical Profemur® Plus CoCr Modular Necks was reported.

241. By the date of January 9, 2014, MicroPort knew that after June of 2013 fractures of a Wright Medical Profemur® Plus CoCr Modular Necks have continued to occur.

242. After January 9, 2014, MicroPort itself began to receive notice of Profemur® Plus CoCr Modular Neck fractures in patients.

243. The fractures of the Profemur® Plus CoCr Modular Necks that MicroPort received notice of were all fractures occurring in the pocket of the Profemur® stem.

244. Prior to February 9, 2015, MicroPort did not inform surgeons using these devices that it had begun to receive notice of fractures of the Profemur® Plus CoCr Modular Necks.

245. Prior to February 9, 2015, MicroPort did not inform surgeons using these devices that fractures were occurring at the neck-stem junction, similar to the hundreds of fractures that had been reported in with the titanium Profemur Modular Necks.

246. MicroPort knew or should have known prior to the date of February 9, 2015:

    a. The Profemur® Plus CoCr Modular Necks had not adequately been tested to simulate in vivo performance for resistance to fretting corrosion;

  b. The Profemur® Plus CoCr Modular Necks had not adequately been tested to simulate in vivo performance for resistance to galvanic corrosion ("battery effect");

  c. Its Profemur® Plus CoCr Modular Necks would be subject to fretting corrosion;

  d. There was an increased risk of fretting corrosion at the neck-stem junction;

  e. There was an increased risk of galvanic corrosion ("battery effect") at the neck-stem junction; and,

  f. The oblong taper of Profemur® Plus CoCr Modular Necks were fracturing in the pocket of the stem.

247. On February 9, 2015, Plaintiff Brandon W. Schaapman was implanted with a long Profemur® Plus CoCr Modular Neck, Ref. No. PHAC-1224.

248. On August 4, 2015, MicroPort initiated Class 1 Voluntary Device Product Recall for its Profemur® Plus CoCr Modular Neck PHAC-1254, Recall Number Z-2743-2015.

249. The Manufacturer Reason for the August 4, 2015, Recall is stated to be: "Unexpected rate of postoperative fractures resulting in the need for revision surgery."

250. The "postoperative fractures resulting in the need for revision surgery" referenced in the August 4, 2015, Recall were all fractures of the oblong taper of a Profemur® Plus CoCr Modular Neck in the pocket of the stem of a Profemur stem.

251. The FDA Determined Cause stated in the August 4, 2015, Recall is stated to be: "Device Design".

252.   The design of the oblong taper of the Profemur® Plus CoCr Modular Neck, Ref. No. PHAC-1224, is identical to the design of the oblong taper of the Profemur® Plus CoCr Modular Neck PHAC-1254.

253.   Class 1 recalls are the most serious type of recall and involve situations in which there is a reasonable probability that use of these products will cause serious adverse health consequences or death.

254.   MicroPort sent a letter dated August 7, 2015, via FedEx, to all affected customers, wherein they were informed of a voluntary hip replacement recall by MicroPort Orthopedics Inc.; surgeons, managers, distributors, and hospitals were instructed to cease distributing and using the Profemur® Plus CoCr Modular Neck PHAC-1254, for hip replacement surgeries.

255.   By letter dated August 7, 2015, MicroPort Orthopedics Inc. informed distributors and hospital staff of a voluntary device product recall.  Distributors and hospital staff, including risk managers and surgeons, were instructed to stop using and distributing the affected product, and return the recalled product to MicroPort Orthopedics Inc. Distribution Center at 11481 Gulf Stream, Arlington, Tennessee 38002.

256.   All lots of the Profemur® Plus CoCr Modular Neck PHAC-1254 were subject to the recall.

257.   Approximately one month after the Class 1 Device Recall of the Profemur Plus CoCr Modular Neck PHAC-1254 was initiated, MicroPort terminated Ted Davis as its President and Chief executive officer, September 8, 2015 being his last day of employment with MicroPort.

258.   On September 28, 2015 the Class 1 Device Recall of the Profemur Plus CoCr Modular Neck PHAC-1254 was "posted" by the FDA on its www.accessdata.fda.gov website.

259.    The PHAC-1254 long varus/valgus 8° neck, and the PHAC-1224 long varus/valgus neck, are made of the same CoCr alloy.

260.    The dimensions and specification for manufacturing the oblong trunnion of the PHAC-1254 long varus/valgus 8° neck, and the PHAC-1224 long varus/valgus neck, are the same.

261.    The design of the oblong trunnion of the PHAC-1254 long varus/valgus 8° neck, and the PHAC-1224 long varus/valgus neck, are the same.

262.    MicroPort Orthopedics Inc., disseminated a "URGENT ACTION REQUIRED" VOLUNTARY DEVICE PRODUCT RECALL notice dated 7/31/2020 by mail to its consignees.

263.    On July 31, 2020, MicroPort initiated Class 2 Voluntary Device Product Recall for all of its Profemur® Plus CoCr Modular Necks, including the PHAC-1224.

264.    The Profemur® Plus CoCr Modular Neck PHAC-1224 implanted in Plaintiff Brandon W. Schaapman was one of the Profemur® Plus CoCr Modular Necks subject to the July 31, 2020 recall.

## OPPRESSIVE, FRAUDULENT, MALICIOUS, AND OUTRAGEOUS CONDUCT

265.    The acts and omissions of Defendant Wright Medical Technology, Inc., as set forth herein are clear and convincing evidence of oppressive, fraudulent, malicious or outrageous conduct.

266.    The acts and omissions of Defendant MicroPort Orthopedics Inc., as set forth herein are clear and convincing evidence of oppressive, fraudulent, malicious, or outrageous conduct.

267.    The failure of Defendant Wright Medical Technology, Inc., to warn patients or surgeons that they had received product complaint data that did indicate an increased risk of fracture with the Profemur® Plus CoCr Modular Necks and adverse events due to taper junction fretting and corrosion, is clear and convincing evidence of oppressive, fraudulent, malicious or

outrageous conduct and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

268.    The failure of Defendant Wright Medical Technology, Inc., to cease the distribution of the Profemur® Plus CoCr Modular Necks before the date of January 9, 2014, is clear and convincing evidence of oppressive, fraudulent, malicious, or outrageous conduct and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

269.    The failure of Defendant Wright Medical Technology, Inc., to recall Profemur® Plus CoCr Modular Necks before the date of January 9, 2014, is clear and convincing evidence of oppressive, fraudulent, malicious, or outrageous conduct and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

270.    The failure of Defendant MicroPort to recall Profemur® Plus CoCr Modular Necks before the date of February 9, 2015, is clear and convincing evidence of oppressive, fraudulent, malicious, or outrageous conduct and demonstrates a complete indifference to, and a conscious disregard for the safety of patients.

## WARRANTIES
## Profemur Plus CoCr Modular Necks

271.    Statements and representations made by Defendants, as set forth in this Complaint, constitute express warranties as to the performance, durability, and capabilities of the Profemur modular necks, and the Profemur hip stems they were intended to be used with.

272.    Defendant MicroPort had never corrected or recanted any of the statements and representations made by Wright Medical, as set forth in this Complaint, which constitute express warranties as to the performance, durability, and capabilities of the Profemur Plus modular necks, and the Profemur hip stems they were intended to be used with.

273.    By law certain implied warranties of merchantability and fitness for intended use are applicable to the MicroPort Profemur® Plus CoCr Modular Necks, and the Profemur hip stems they were intended to be used with.

274.    The micromotion, fretting corrosion, galvanic corrosion, and fracture of Plaintiff Brandon W. Schaapman's MicroPort Profemur® Plus CoCr Modular Neck, at the junction with the Profemur® Stem was a breach of the applicable express warranties of Defendant MicroPort.

275.    The failure of Plaintiff Brandon W. Schaapman's MicroPort Profemur® Plus CoCr Modular Neck was a breach of the applicable express warranties of Defendant MicroPort.

276.    The fracture of Plaintiff Brandon W. Schaapman's MicroPort Profemur® Plus CoCr Modular Neck was a breach of the applicable implied warranties of merchantability and fitness for intended use by Defendant MicroPort.

## PLAINTIFF'S INJURIES AND DAMAGES

277.    On or about November 29, 2022, due to micromotion and fretting corrosion of the oblong taper of the Profemur® Plus CoCr Modular Neck where it seated in the pocket of the Profemur® stem, the Profemur® Plus CoCr Modular Neck implanted in Plaintiff Brandon W. Schaapman's hip catastrophically failed, breaking into two pieces, causing physical injury to Plaintiff.

278.    As a direct and proximate result of the conduct of Defendant Wright Medical Technology, Inc., and Defendant MicroPort Orthopedics Inc., as set forth in this Complaint, Plaintiff Brandon W. Schaapman sustained injuries and damages including, but not limited to undergoing surgery to remove and replace his failed Profemur hip devices; past and future pain and anguish, both in mind and in body; permanent diminishment of his ability to participate in and enjoy the affairs of life; medical bills associated with the replacement procedure and recovery

therefrom; future medical expenses; loss of enjoyment of life; loss of past and future earnings and earning capacity; disfigurement; physical impairment; and other injuries and damages not fully known at this time.

279.    Plaintiff Brandon W. Schaapman's injuries suffered were both factually and proximately caused by the defective products of Defendant Wright Medical Technology, Inc.

280.    Plaintiff Brandon W. Schaapman's injuries suffered were both factually and proximately caused by the unreasonably dangerous products of Defendant Wright Medical Technology, Inc.

281.    Plaintiff Brandon W. Schaapman's injuries suffered were both factually and proximately caused by the defective products of Defendant MicroPort Orthopedics Inc.

282.    Plaintiff Brandon W. Schaapman's injuries suffered were both factually and proximately caused by the unreasonably dangerous products of Defendant MicroPort Orthopedics Inc.

283.    Plaintiff Brandon W. Schaapman is entitled to recover for all economic and special damages incurred, including but not limited to damages for surgery, rehabilitative services, follow up doctor visits, and all expenditures incurred as a result of the surgery and follow up procedures.

284.    Plaintiff Brandon W. Schaapman is entitled to recovery for lost wages, having been disabled and diminished ability to earn income.

285.    Plaintiff Brandon W. Schaapman is entitled to compensation for permanent disability as a result of the failure of this hip replacement device which caused substantial injury.

286.    Plaintiff Brandon W. Schaapman further is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, all pain and suffering

that he has incurred as a result of the defective product, the follow-up surgery, rehabilitation, and constant pain that occurs as a result of the failure of the product.

## LIABILITY

### COUNT I
### NEGLIGENCE of WRIGHT MEDICAL
### for the
### Profemur® Plus CoCr Modular Neck

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in this Complaint.

287.    Defendant Wright Medical Technology, Inc., owed a duty of reasonable care to the general public, including Plaintiff, when it designed, manufactured, assembled, inspected, tested, marketed, placed into the stream of commerce, and sold the Wright Medical Profemur® Plus Profemur modular neck, and the Wright Medical Profemur® Total Hip System, to assure that the Wright Medical Profemur® modular neck, and the Wright Medical Profemur® Total Hip System were not defective and/or unreasonably dangerous for their intended purposes and foreseeable uses.

288.    Defendant Wright Medical Technology, Inc., breached this duty by designing, manufacturing, assembling, inspecting, testing, marketing, distributing, and selling the Wright Medical Profemur® Plus Modular Neck, and the Wright Medical Profemur® Total Hip System in a defective and unreasonably unsafe condition including, but not limited to, its propensity for fracture at the neck.

289.    Defendant Wright Medical Technology, Inc., owed Plaintiff a duty of reasonable care to discover the defect and to inform and/or warn Plaintiff, or his surgeons, of the defect once it was discovered, and Defendants failed to do so further placing Plaintiff at risk for harm and injury.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 50

290.    Defendant Wright Medical Technology, Inc., owed Plaintiff a duty of reasonable care to discover the defect and to inform and/or warn Plaintiff, or his surgeons, of the defect once it was discovered, and Defendants failed to do so further placing Plaintiff at risk for harm and injury.

291.    Defendant Wright Medical was negligent in its failure to recall the Wright Medical Profemur® Plus modular neck before the date of January 9, 2014.

292.    Defendant Wright Medical Technology, Inc., otherwise was negligent in the particulars set forth in this Complaint, and such negligence was a direct and proximate cause of the incident and injuries and damages set forth herein.

293.    The negligence of Defendant Wright Medical Technology, Inc., as set forth in this Complaint, directly and proximately caused the injuries and damages alleged in this Complaint.

294.    Defendant Wright Medical Technology, Inc., owed a duty of reasonable care to the general public, including Plaintiff, when it designed the Profemur® Plus CoCr Modular Neck, to assure that the Profemur® CoCr modular neck, when mated with the Wright Medical Profemur® Total Hip System, were not defective and/or unreasonably dangerous for their intended purposes and foreseeable uses.

295.    Defendant Wright Medical Technology, Inc., breached its duty of reasonable care to the general public, including Plaintiff, when it designed the Profemur® Plus CoCr Modular Neck, in that the Profemur® CoCr modular neck, when mated with the Wright Medical Profemur® Total Hip System, is defective and/or unreasonably dangerous for their intended purposes and foreseeable uses.

296.    Defendant Wright Medical Technology, Inc., owed a duty of reasonable care to the general public, including Plaintiff, when it manufactured the Profemur® Plus Modular Neck, to

assure that the Profemur® Plus CoCr modular neck, when mated with the Wright Medical Profemur® Total Hip System, were:

    a. Manufactured in conformance with its intended design specifications;

    b. Manufactured without defects; and,

    c. Not defective and/or unreasonably dangerous for their intended purposes and foreseeable uses.

297. Defendant Wright Medical Technology, Inc., breached its duty of reasonable care to the general public, including Plaintiff, when it manufactured the Profemur® Plus Modular Neck, in that the Profemur® Plus CoCr modular neck, when mated with the Wright Medical Profemur® Total Hip System, were:

    a. Not manufactured in conformance with its intended design specifications;

    b. Manufactured with defects; and,

    c. Were defective and/or unreasonably dangerous for their intended purposes and foreseeable uses.

298. Defendant Wright Medical Technology, Inc., owed Plaintiff a duty of reasonable care to discover the defect and to inform and/or warn Plaintiff, or his surgeons, of the defect(s) once it or they were discovered, and Defendants failed to do so further placing Plaintiff at risk for harm and injury.

299. Defendant Wright Medical Technology, Inc., breached its duty of reasonable care in that it did not discover the defects and to inform and/or warn Plaintiff, or his surgeons, of the defect once it was discovered, placing Plaintiff at risk for harm and injury.

300. Defendant Wright Medical Technology, Inc., owed a duty of reasonable care to:

a.  Timely inform surgeons using its products of the issue of corrosion at the neck-stem junction with the Profemur Plus CoCr Modular Necks;

b.  Remove the Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of corrosion at the neck-stem junction;

c.  Recall Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of corrosion at the neck-stem junction;

d.  Timely inform surgeons using its products of the issue of fractures at the neck-stem junction with the Profemur Plus CoCr Modular Necks;

e.  Remove the Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of fractures at the neck-stem junction;

f.  To timely inform MicroPort, before its purchase of the Wright Medical Ortho Recon operating segment, that Profemur Plus CoCr Modular Necks were corroding after implantation; and,

g.  To timely inform MicroPort, before its purchase of the Wright Medical Ortho Recon operating segment, that Profemur Plus CoCr Modular Necks, were fracturing after implantation.

301.    Defendant Wright Medical Technology, Inc., breached these duties of reasonable care in that it failed to:

a.  Timely inform surgeons using its products of the issue of corrosion at the neck-stem junction with the Profemur Plus CoCr Modular Necks;

b.  Remove the Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of corrosion at the neck-stem junction;

c. Recall Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of corrosion at the neck-stem junction;

d. Timely inform surgeons using its products of the issue of fractures at the neck-stem junction with the Profemur Plus CoCr Modular Necks;

e. Remove the Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of fractures at the neck-stem junction;

f. Timely inform MicroPort once it became aware of the issue of corrosion at the neck-stem junction of the Profemur Plus CoCr Modular Neck, before MicroPort purchased the Wright Medical OrthoRecon operating segment; and,

g. Timely inform MicroPort once it became aware of the issue of fractures at the neck-stem junction of the Profemur Plus CoCr Modular Necks before MicroPort Purchased the Wright Medical OrthoRecon operating segment.

302. Defendant Wright Medical Technology, Inc., otherwise was negligent in the particulars set forth in this Complaint, and such negligence was a direct and proximate cause of the incident and injuries and damages set forth herein.

303. The negligence of Defendant Wright Medical Technology, Inc., as set forth in this Complaint, directly and proximately caused the injuries and damages alleged in this Complaint.

## COUNT II

### NEGLIGENCE of MICROPORT
for the
Profemur® Plus CoCr Modular Neck

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

304. Defendant MicroPort Orthopedics Inc., owed Plaintiff a duty of reasonable care to discover the defects and to inform and/or warn Plaintiff, or his surgeons, of the defects once discovered, and Defendants failed to do so further placing Plaintiff at risk for harm and injury.

305. Defendant MicroPort Orthopedics Inc., breached its duty of reasonable care in that it did not discover the defects and to inform and/or warn Plaintiff, or his surgeons, of the defects once discovered, placing Plaintiff at risk for harm and injury.

306. Defendant MicroPort Orthopedics Inc., owed a duty of reasonable care to:

    a. Timely inform surgeons using its products of the issue of corrosion at the neck-stem junction with the Profemur Plus CoCr Modular Necks;

    b. Remove the Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of corrosion at the neck-stem junction;

    c. Recall Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of corrosion at the neck-stem junction;

    d. Timely inform surgeons using its products of the issue of fractures at the neck-stem junction with the Profemur Plus CoCr Modular Necks;

    e. Remove the Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of fractures at the neck-stem junction; and,

    f. Recall the Profemur Plus CoCr Modular Necks, before February 9, 2015.

307. Defendant MicroPort Orthopedics Inc., breached these duties of reasonable care in that it failed to:

a.  Timely inform surgeons using its products of the issue of corrosion at the neck-stem junction with the Profemur Plus CoCr Modular Necks;

b.  Remove the Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of corrosion at the neck-stem junction;

c.  Recall Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of corrosion at the neck-stem junction;

d.  Timely inform surgeons using its products of the issue of fractures at the neck-stem junction with the Profemur Plus CoCr Modular Necks;

e.  Remove the Profemur Plus CoCr Modular Necks from the market once it became aware of the issue of fractures at the neck-stem junction; and;

f.  Recall the Profemur Plus CoCr Modular Necks, before February 9, 2015.

308.    Defendant Wright Medical Technology, Inc., and Defendant MicroPort Orthopedics Inc., otherwise were each negligent in the particulars set forth in this Complaint, and such negligence was a direct and proximate cause of the incident and injuries set forth herein.

309.    The negligence of Defendant Wright Medical Technology, Inc., and Defendant MicroPort Orthopedics Inc., as set forth in this Complaint, directly and proximately caused the injuries and damages alleged in this Complaint.

## COUNT III

### STRICT PRODUCTS LIABILITY
for
### DEFECTIVE DESIGN and FAILURE TO WARN
by
### WRIGHT MEDICAL

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

310.    The Wright Medical Profemur® Plus Modular Neck, and the Wright Medical Profemur® Total Hip System, designed and manufactured by Wright Medical, implanted in Plaintiff, was unreasonably dangerous in that they were more dangerous than would be expected by an ordinary person who may reasonably be expected to use it.

311.    The Wright Medical Profemur® Plus Modular Neck, and the Wright Medical Profemur® Total Hip System, used in Plaintiff's hip replacement surgery were not reasonably safe for their intended uses and were defective as described herein with respect to the design.

312.    The Wright Medical Profemur® Plus Modular Neck, and the Wright Medical Profemur® Total Hip System, possessed defective and dangerous characteristics, as described herein, and Defendant Wright Medical Technology, Inc., failed to use reasonable care to provide an adequate warning of such characteristics and their dangers to health care providers and patients, including Plaintiff.

313.    At the time of the incident set forth herein, the Wright Medical Profemur® Plus Modular Neck, and the Wright Medical Profemur® Total Hip System were dangerous to an extent beyond that which would be contemplated by the ordinary health care provider, and patient, with the ordinary knowledge common to the medical community as to the products' characteristics.

314.    Health care providers and patients, including Plaintiff, did not know and should not have been expected to know of the dangerous characteristics of the Wright Medical Profemur® Plus Modular Neck, and the Wright Medical Profemur® Total Hip System.

315.    As a direct and proximate result of Defendant Wright Medical's failure to warn, Plaintiff sustained serious injuries and was damaged.

316.    The conduct of Defendant Wright Medical, as set forth in this Complaint, directly and proximately caused the injuries and damages alleged in this Complaint.

## COUNT IV

### STRICT PRODUCTS LIABILITY
#### for
### DEFECTIVE DESIGN and FAILURE TO WARN
#### by
### MICROPORT

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

317.    The Wright Medical Profemur® Plus Modular Neck, sold and distributed by MicroPort, implanted in Plaintiff's hip revision surgery, was unreasonably dangerous in that they were more dangerous than would be expected by an ordinary person who may reasonably be expected to use it.

318.    The Profemur® Plus Modular Neck, sold and distributed by MicroPort, implanted in Plaintiff's hip revision surgery, was not reasonably safe for its intended uses and was defective as described herein with respect to the design.

319.    The Profemur® Plus Modular Neck, sold and distributed by MicroPort, implanted in Plaintiff's hip revision surgery, had defective and dangerous characteristics, as described herein, and the Defendant MicroPort failed to use reasonable care to provide an adequate warning of such characteristics and their dangers to health care providers and patients, including Plaintiff.

320.    At the time of the incident set forth herein, the Profemur® Plus Modular Neck, was dangerous to an extent beyond that which would be contemplated by the ordinary health care provider, and patient, with the ordinary knowledge common to the medical community as to the products' characteristics. ·

321.    Health care providers and patients, including Plaintiff, did not know and should not have been expected to know of the dangerous characteristics of the Profemur® Plus Modular Neck.

322.    As a direct and proximate result of Defendant MicroPort's failure to warn, Plaintiff sustained serious injuries and was damaged.

323.    To the extent that Defendant MicroPort Orthopedics Inc., has assumed or acquired legal liability related to the Profemur® Plus CoCr modular necks by its acquisition of the Wright Medical OrthoRecon operating segment in January 2014, Defendant MicroPort Orthopedics Inc., is liable to Plaintiff for the conduct, injuries, and damages alleged in this count of this Complaint.

324.    The conduct of Defendant MicroPort Orthopedics Inc., as set forth in this Complaint, directly and proximately caused the injuries and damages alleged in this Complaint.

## COUNT V

### BREACH OF WARRANTY
### WRIGHT MEDICAL and MICROPORT

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

325.    Defendant Wright Medical Technology, Inc., warranted, both expressly and impliedly, through its marketing, advertising, distributors, and sales representatives, that Profemur® Modular Necks, and the Profemur® Total Hip System were of merchantable quality, fit for the ordinary purposes and uses for which they were sold.

326.    Defendant MicroPort Orthopedics Inc., warranted, both expressly and impliedly, through its marketing, advertising, distributors, and sales representatives, that Profemur® Modular Necks, and the Profemur® Total Hip System were of merchantable quality, fit for the ordinary purposes and uses for which they were sold.

327. Defendant Wright Medical Technology, Inc., and MicroPort Orthopedics Inc., each were aware that orthopedic surgeons, including Plaintiff's orthopedic surgeons, rely upon the representations made by Defendants and their representatives when choosing, selecting and purchasing its products, including the Profemur® Plus Modular Necks, and the Profemur® Total Hip System.

328. Due to the defective and unreasonably dangerous design and manufacture of the Profemur® Plus CoCr Modular Necks and the Profemur® Total Hip System, it was neither of merchantable quality nor fit for the ordinary purposes for which it was sold, presenting an unreasonable risk of injury to patients, including Plaintiff, for expected and foreseeable use.

329. The defective and unreasonably dangerous condition of the Profemur® Plus CoCr Modular Neck, and the Profemur® Total Hip System, constituted a breach of the express and implied warranties, and such breach was a direct and proximate cause of the incident and injuries described herein.

330. To the extent that Defendant MicroPort Orthopedics Inc., has assumed or acquired legal liability related to the Wright Medical Profemur® Plus CoCr modular necks by its acquisition of the Wright Medical OrthoRecon operating segment in January 2014, Defendant MicroPort Orthopedics Inc., is liable to Plaintiff for the conduct, injuries, and damages alleged in this count of this Complaint.

331. After acquisition of the Wright Medical OrthoRecon operating segment in January of 2014, Defendant MicroPort Orthopedics Inc., ratified and continued to make and be bound by the same warranties as had its predecessor, Wright Medical.

## COUNT VI

## NEGLIGENT and INTENTIONAL MISREPRESENTATION

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

332.    Defendants Wright Medical Technology, Inc., and MicroPort Orthopedics Inc., each had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public the clinical history of the Profemur Modular Necks, their performance capabilities, and that Profemur® Plus CoCr modular necks, and the Profemur® Total Hip System, had not been adequately tested. Instead, the statements as to the clinical history, performance, and testing made by Defendants, as set forth about in this complaint, were false and misleading.

333.    Had Defendants accurately and truthfully represented to the medical community, Plaintiff, and the public the material facts relating to the clinical history of the Profemur Modular Necks, their performance capabilities, and testing, Plaintiff and/or Plaintiff's healthcare provider would not have utilized Defendant's Wright Medical Profemur® Plus CoCr modular necks for Plaintiff's hip replace or revision surgery.

334.    As a direct and proximate result of Defendants negligent misrepresentations, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

335.    To the extent that Defendant MicroPort Orthopedics Inc., has assumed or acquired legal liability related to the Profemur® Plus CoCr modular necks, by its acquisition of the Wright Medical OrthoRecon operating segment in January 2014, and the distribution and sale of the Profemur® Plus CoCr modular neck implanted in Plaintiff on February 9, 2015, Defendant

MicroPort Orthopedics Inc., is liable to Plaintiff for the conduct, injuries, and damages alleged in this count of this Complaint.

336.    After acquisition of the Wright Medical OrthoRecon operating segment in January of 2014, Defendant MicroPort Orthopedics Inc., continued to engage in the same misrepresentations as had its predecessor, Wright Medical.

## COUNT VII

## NEGLIGENCE POST-SALE

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

337.    After Defendants Wright Medical Technology, Inc., and MicroPort Orthopedics Inc., began to receive notice that the Profemur® Plus CoCr Modular Necks were fracturing, just as had hundreds of the Wright Medical titanium Profemur Modular necks, they did not provide post sale warnings to patients who had these devices implanted that included the following information:

   a. The modular neck of their hip may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

   b. If the modular neck of their hip did suddenly and catastrophically fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were, and what they were doing, at the time of the failure, they could suffer serious injury or death; and,

   c. These devices were structurally failing by fractures of the modular necks in patients of many different weights and levels of activity.

338.    After Defendants Wright Medical Technology, Inc., and MicroPort Orthopedics Inc., received notice that the Profemur® Plus CoCr modular necks were failing from structural failure of the modular neck by fractures, they did not request surgeons who implanted these devices to provide patients with these devices, at Defendants' expense, post-sale warnings that included the following information:

    a.  The modular neck of their hip may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

    b.  If the modular neck of their hip did suddenly and catastrophically structurally fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were, and what they were doing, at the time of the failure, they could suffer serious injury or death;

    c.  These devices were structurally failing by fractures of the modular necks in patients of many different weights and levels of activity; and,

    d.  These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" when being used by patients for work, recreation, and lifestyles that Defendant Wright Medical had marketed and advertised these devices as being appropriate for.

339.    The conduct of the Defendants Wright Medical Technology, Inc., and MicroPort Orthopedics Inc., to provide post-sale warnings, as set forth above, was negligent.

340.    The conduct of the Defendants Wright Medical Technology, Inc., and MicroPort Orthopedics Inc., as set forth above, directly and proximately caused injuries and damages to Plaintiff.

341.    To the extent that Defendant MicroPort Orthopedics Inc., has assumed or acquired legal liability related to the Profemur® Plus CoCr modular necks by its acquisition of the Wright Medical OrthoRecon operating segment in January 2014, Defendant MicroPort Orthopedics Inc., is liable to Plaintiff for the conduct, injuries, and damages alleged in this count of this Complaint.

## COUNT VIII

## MISREPRESENTATION BY OMISSION

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

342.    Throughout the relevant time period, Defendant Wright Medical Technology, Inc., knew that its Profemur® Plus CoCr modular necks and the Profemur® Total Hip System were defective and unreasonably unsafe for their intended purpose.

343.    Defendants were under a duty to disclose to Plaintiff and the medical community the defective nature of the Profemur® Plus CoCr modular necks and the Profemur® Total Hip System because Defendants were in a superior position to know the true quality, safety, and efficacy of the Profemur® CoCr modular neck, and the Wright Medical Profemur® Total Hip System.

344.    Defendants fraudulently concealed from and/or failed to disclose to Plaintiff, Plaintiff's surgeon, and the medical community that the Profemur® Plus CoCr modular necks and the Profemur® Total Hip System were defective, unsafe, and unfit for the purposes intended, and that they were not of merchantable quality.

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 64

345.    The facts concealed and/or not disclosed to Plaintiff and the medical community were material facts that a reasonable person would have considered important in deciding whether to utilize Defendants' Profemur® Plus CoCr modular necks and the Profemur® Total Hip System.

346.    As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

347.    To the extent that Defendant MicroPort Orthopedics Inc., has assumed or acquired legal liability related to the Profemur® Plus CoCr modular necks by its acquisition of the Wright Medical OrthoRecon operating segment in January 2014, Defendant MicroPort Orthopedics Inc., is liable to Plaintiff for the conduct, injuries, and damages alleged in this count of this Complaint.

348.    After acquisition of the Wright Medical OrthoRecon operating segment in January of 2014, Defendant MicroPort Orthopedics Inc., continued to engage in the same misrepresentations by omission as had its predecessor, Wright Medical.

## COUNT IX

## OPPRESSIVE, FRAUDULENT, MALICIOUS OR OUTRAGEOUS CONDUCT

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

349.    The acts and omissions of Defendant Wright Medical Technology, Inc., as set forth herein are clear and convincing evidence of oppressive, fraudulent, malicious, or outrageous conduct.

350.    The acts and omissions of Defendant MicroPort Orthopedics Inc., as set forth herein are clear and convincing evidence of oppressive, fraudulent, malicious, or outrageous conduct.

351.    Plaintiff reserves this paragraph for the inclusion of a claim for damages pursuant to Idaho Code § 6-1604.

## DAMAGES

Plaintiff incorporates by reference as if fully set forth verbatim each and every allegation in the Complaint.

352.    As a direct and proximate result of the acts and omissions of Defendants alleged herein, Plaintiff was injured and damaged.  The injuries and damages for which Plaintiff seeks compensation from Defendants include, but are not limited to:

   a.   physical pain and suffering of a past, present and future nature;

   b.   emotional/mental pain and suffering of a past, present and future nature;

   c.   permanent impairment and scarring;

   d.   impairment of abilities to perform usual activities;

   e.   disfigurement caused by the injuries;

   f.   medical bills and expenses of a past, present and future nature;

   g.   loss of earnings;

   h.   loss of earning capacity;

   i.   loss of enjoyment of life;

   j.   pre- and post-judgment interest;

   k.   statutory and discretionary costs and attorney fees pursuant to Idaho Code § 12-120, 12-121, Idaho Rules of Civil Procedure 54(d) and 54(e), and all other applicable state law; and,

COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 66

l.   all such further relief, both general and specific, to which he may be entitled

to under the premises.

**WHEREFORE**, Plaintiff, Brandon W. Schaapman, prays for entry of judgment for such

damages as are reasonable in the premises to compensate him for his economic and non-

economic injuries, damages, and losses, and for any further and additional relief as this Court

deems just and proper, plus interest and costs.

## PLAINTIFF DEMANDS A TRIAL BY JURY OF NO LESS THAN

## TWELVE PERSONS ON ALL ISSUES.

Dated:  April 9th, 2024.            Respectfully submitted,

LITSTER FROST INJURY LAWYERS


*/s/ Evan S. Mortimer*
Evan S. Mortimer, ISB# 9758
Litster Frost Injury Lawyers
3501 W. Elder Street, Ste. 208
Boise, ID 83705
208-489-6400
Evan.Mortimer@litsterfrost.com
*Attorneys for Plaintiff*


*/s/ George E. McLaughlin*
George E. McLaughlin, Colorado Bar #16364
McLaughlin Law Firm, P.C.
1890 Gaylord St.
Denver, CO 80206
720-420-9800
GEM@McLLF.com

*Pro Hac Vice Admission to be Requested*
*Attorneys for Plaintiff*


COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND - 67

Electronically Filed
4/10/2024 12:10 PM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Dharyan Cox, Deputy Clerk

Evan S. Mortimer, ISB# 9758
**LITSTER FROST INJURY LAWYERS**
3501 W. Elder Street, Suite 208
Boise, Idaho 83705
Telephone: (208) 489-6400
Fax: (208) 489-6404
evan.mortimer@litsterfrost.com

Baskin, Nancy

*Attorneys for Plaintiff*

George E. McLaughlin, Colorado Bar # 16364
*Pro Hac Vice* Admission to be Requested
McLaughlin Law Firm, PC
1890 Gaylord Street
Denver, Colorado 80206-1211
Telephone (720) 420-9800
Facsimile (303) 322-3423

*Attorneys for Plaintiff*

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

## OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| **BRANDON W. SCHAAPMAN, an individual,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**WRIGHT MEDICAL TECHNOLOGY, INC., a Delaware corporation; and, MICROPORT ORTHOPEDICS INC., a Delaware corporation,**<br><br>    **Defendants.** | Case No. CV01-24-06207<br><br>**SUMMONS** |

**TO:   WRIGHT MEDICAL TECHNOLOGY, INC.**

NOTICE:  YOU HAVE BEEN SUED BY THE ABOVE-NAMED PLAINTIFF(S). THE COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE UNLESS YOU RESPOND WITHIN TWENTY-ONE (21) DAYS. READ THE INFORMATION BELOW.

SUMMONS - 1

You are hereby notified that, in order to defend this lawsuit, an appropriate written response must be filed with the above designated court at 200 W. Front Street, Boise, Idaho 83702, (208) 287-6900, within twenty-one (21) days after service of this Summons on you. If you fail to respond, the court may enter judgment against you as demanded by the Plaintiff(s) in the Complaint.

A copy of the Complaint is served with this Summons. If you wish to seek the advice or representation by an attorney in this matter, you should do so promptly so that your written response, if any, may be filed in time and other legal rights protected.

An appropriate written response requires compliance with Rule 2 and other Idaho Rules of Civil Procedure and shall also include:

1. The title and number of this case.

2. If your response is an Answer to the Complaint, it must contain admissions or denials of the separate allegations of the Complaint and other defenses you may claim.

3. Your signature, mailing address and telephone number, or the signature, mailing address and telephone number of your attorney.

4. Proof of mailing or delivery of a copy of your response to Plaintiff's attorney, as designated above.

To determine whether you must pay a filing fee with your response, contact the Clerk of the above-named court.

DATED __4/10/2024 12:10 PM_____.

TRENT TRIPPLE
CLERK OF THE DISTRICT COURT

_Dharyan Cox_
Deputy Clerk

SUMMONS - 2



Electronically Filed
4/10/2024 12:10 PM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Dharyan Cox, Deputy Clerk

Evan S. Mortimer, ISB# 9758
**LITSTER FROST INJURY LAWYERS**
3501 W. Elder Street, Suite 208
Boise, Idaho 83705
Telephone: (208) 489-6400
Fax: (208) 489-6404
evan.mortimer@litsterfrost.com

Baskin, Nancy

*Attorneys for Plaintiff*

George E. McLaughlin, Colorado Bar # 16364
*Pro Hac Vice* Admission to be Requested
McLaughlin Law Firm, PC
1890 Gaylord Street
Denver, Colorado 80206-1211
Telephone (720) 420-9800
Facsimile (303) 322-3423

*Attorneys for Plaintiff*

### IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

### OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| **BRANDON W. SCHAAPMAN, an individual,** | |
| Plaintiff, | Case No. CV01-24-06207 |
| v. | **SUMMONS** |
| **WRIGHT MEDICAL TECHNOLOGY, INC., a Delaware corporation; and, MICROPORT ORTHOPEDICS INC., a Delaware corporation,** | |
| Defendants. | |

**TO:  MICROPORT ORTHOPEDICS INC.**

NOTICE: YOU HAVE BEEN SUED BY THE ABOVE-NAMED PLAINTIFF(S). THE
COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE
UNLESS YOU RESPOND WITHIN TWENTY-ONE (21) DAYS. READ THE
INFORMATION BELOW.

SUMMONS - 1

You are hereby notified that, in order to defend this lawsuit, an appropriate written response must be filed with the above designated court at 200 W. Front Street, Boise, Idaho 83702, (208) 287-6900, within twenty-one (21) days after service of this Summons on you. If you fail to respond, the court may enter judgment against you as demanded by the Plaintiff(s) in the Complaint.

A copy of the Complaint is served with this Summons. If you wish to seek the advice or representation by an attorney in this matter, you should do so promptly so that your written response, if any, may be filed in time and other legal rights protected.

An appropriate written response requires compliance with Rule 2 and other Idaho Rules of Civil Procedure and shall also include:

1.    The title and number of this case.

2.    If your response is an Answer to the Complaint, it must contain admissions or denials of the separate allegations of the Complaint and other defenses you may claim.

3.    Your signature, mailing address and telephone number, or the signature, mailing address and telephone number of your attorney.

4.    Proof of mailing or delivery of a copy of your response to Plaintiff's attorney, as designated above.

To determine whether you must pay a filing fee with your response, contact the Clerk of the above-named court.

DATED ___4/10/2024 12:10 PM___.

TRENT TRIPPLE
CLERK OF THE DISTRICT COURT



Dharyan Cox
Deputy Clerk

Electronically Filed
4/30/2024 2:31 PM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Eric Rowell, Deputy Clerk

**Evan S. Mortimer, ISB# 9758**
**LITSTER FROST INJURY LAWYERS**
**3501 W. Elder Street, Suite 208**
**Boise, Idaho 83705**
**Telephone: (208) 489-6400**
**Fax: (208) 489-6404**
**evan.mortimer@litsterfrost.com**

*Attorneys for Plaintiff*

**George E. McLaughlin, Colorado Bar # 16364**
*Pro Hac Vice* **Admission to be Requested**
**McLaughlin Law Firm, P.C.**
**1890 Gaylord Street**
**Denver, Colorado 80206-1211**
**Telephone: (720) 420-9800**
**Fax: (303) 322-3423**
**GEM@McLLF.com**

*Attorneys for Plaintiff*

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

## OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| **BRANDON W. SCHAAPMAN,**<br>**an individual,**<br><br>                    **Plaintiff,**<br><br>**v.**<br><br>**WRIGHT MEDICAL TECHNOLOGY, INC.,**<br>**a Delaware corporation; and,**<br>**MICROPORT ORTHOPEDICS INC.,**<br>**a Delaware corporation,**<br><br>                    **Defendants.** | **Case No. CV01-24-06207**<br><br><br>**MOTION FOR**<br>***PRO HAC VICE* ADMISSION** |

Pursuant to I.B.C.R. 227, Evan S. Mortimer, of the Firm, Litster Frost Injury Lawyers,

petitions the Court for admission of George E. McLaughlin, *pro hac vice*, in this case.

George E. McLaughlin certifies that he is an active member, in good standing, of the bar of the state of Colorado, that he maintains the regular practice of law at the above-noted address, and that he is not a resident of the State of Idaho or licensed to practice in Idaho.  George E. McLaughlin certifies that he has not previously been admitted under I.B.C.R. 227.

Undersigned counsel certify that a copy of this motion has been served on all other parties, if any, who have appeared in this case and that a copy of the motion, accompanied by a $325 fee and a certificate of good standing, have been submitted to the Idaho State Bar.

Counsel certify that the above information is true to the best of their knowledge.  Evan S. Mortimer acknowledges that his attendance shall be required at all court proceedings in which George E. McLaughlin appears, unless specifically excused by the trial judge.

DATED this 30th day of April 2024.

/s/ *Evan S. Mortimer*
Evan S. Mortimer, ISB # 9758
Local Counsel for Plaintiff


/s/ *George E. McLaughlin*
George E. McLaughlin
*Pro Hac Vice* Counsel for Plaintiff

Filed 05/06/2024 11:57:31
Fourth Judicial District, Ada County
**Trent Tripple, Clerk of the Court**
By: Deputy Clerk - Moritz Gutierrez, Caterina

# IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

## OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

BRANDON W. SCHAAPMAN,
an individual,

          **Plaintiff,**

v.

WRIGHT MEDICAL TECHNOLOGY, INC.,
a Delaware corporation; and,
MICROPORT ORTHOPEDICS INC.,
a Delaware corporation,

          **Defendants.**

**Case No. CV01-24-06207**

**ORDER GRANTING MOTION FOR**
***PRO HAC VICE* ADMISSION**

The Court has considered the Motion for *Pro Hac Vice* filed on April \_\_\_\_, 2024 and being

fully advised in the premises, it is hereby ordered that George E. McLaughlin be admitted *pro hac*

*vice* in this case and that Evan S. Mortimer serve as Local Counsel, whose attendance shall be

required in all court proceedings in which George E. McLaughlin appears, unless specifically

excused by the Court.

      DATED:_____.    5/3/2024 11:53:09 AM

                                              *Nancy A. Baskin*

                                         DISTRICT JUDGE

## CERTIFICATE OF SERVICE

  I HEREBY CERTIFY on _____5/6/2024 2:57:35 PM_____, I caused to be served a true and accurate copy of the foregoing document upon the following attorney(s) by the method indicated:


Evan S. Mortimer     ☐ U.S. Mail, postage prepaid
LITSTER FROST INJURY LAWYERS  ☐ Hand-Delivered
3501 W. Elder St., Ste. 208   ☐ Facsimile
Boise, ID 83705     ☒ E-Mail
F: (208) 489-6404    ☐ iCourt/e-File
evan.mortimer@litsterfrost.com

*Local Counsel for Plaintiff*

George E. McLaughlin    ☐ U.S. Mail, postage prepaid
MCLAUGHLIN LAW FIRM, PC   ☐ Hand-Delivered
1890 Gaylord Street    ☐ Facsimile
Denver, CO 80206    ☒ E-Mail
F: (303) 322-3423    ☐ iCourt/e-File
gem@mcllf.com

*Pro Hac Vice Counsel for Plaintiff*


_____
Clerk

Electronically Filed
7/10/2024 11:17 AM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Erica Weekley, Deputy Clerk

# IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF
# THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | | |
|---|---|---|
| Brandon W. Schaapman | Plaintiff(s): | **DECLARATION OF SERVICE** |
| vs. | | |
| Wright Medical Technology, Inc., et al. | Defendant(s): | Case Number: CV01-24-06207 |

For:
Litster Frost Injury Lawyers
3501 W. Elder St., Ste. 208
Boise, ID 83705

Received by Tri-County Process Serving LLC on July 1, 2024 to be served on **WRIGHT MEDICAL TECHNOLOGY, INC.**

**I, Kasey L. Vink, state that on Monday, July 1, 2024, at 2:28 PM,** I served the within named **Wright Medical Technology, Inc.** by delivering a true copy of the **Summons, Complaint for Damages and Jury Trial Demand** to Chelsea Gerard of CT Corporation System, Registered Agent for Wright Medical Technology, Inc., a person authorized to accept service on behalf of Wright Medical Technology, Inc. Said service was effected at **1555 W. Shoreline Dr., Ste. 100, Boise, ID 83702**.

Approximate description of Chelsea Gerard
  Female  26 years old,  5' 6" Tall,  170 lbs,  Blonde  Hair,  Blue  eyes.

I hereby acknowledge that I am a Process Server in the county in which service was effected. I am over the age of eighteen years and not a party to the action. I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

Our Reference Number: 213718
Client Reference: Evan S. Mortimer

Tuesday, July 9, 2024

**TRI-COUNTY PROCESS SERVING LLC**
P.O. Box 1224
Boise, ID, 83701
(208) 344-4132

**KASEY VINK**

Electronically Filed
7/21/2024 2:14 PM
Fourth Judicial District, Ada County
Trent Tripple, Clerk of the Court
By: Nicole Davis, Deputy Clerk

# IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

Brandon W. Schaapman

Plaintiff(s):

vs.

Wright Medical Technology, Inc., et al.

Defendant(s):

## DECLARATION OF SERVICE

Case Number: CV01-24-06207

For:
Litster Frost Injury Lawyers
3501 W. Elder St., Ste. 208
Boise, ID 83705

Received by Tri-County Process Serving LLC on July 16, 2024 to be served on **MICROPORT ORTHOPEDICS, INC.**

**I, Elaina Teninty, state that on Wednesday, July 17, 2024, at 11:07 AM,** I served the within named **Microport Orthopedics, Inc.** by delivering a true copy of the **Summons; Complaint for Damages and Jury Trial Demand; Plaintiff's First Set of Interrogatories to Defendant Microport Orthopedics Inc.; Plaintiff's First Requests for Production of Documents to Defendant Microport Orthopedics Inc.** to Nicole Fruh-Wise of CT Corporation System, Registered Agent for Microport Orthopedics, Inc., a person authorized to accept service on behalf of Microport Orthopedics, Inc. Said service was effected at **1555 W. Shoreline Dr., Ste. 100, Boise, ID 83702.**

Approximate description of Nicole Fruh-Wise
White Female 35 years old, 5' 2" Tall, 140 lbs, Brown Hair, Brown eyes.

I hereby acknowledge that I am a Process Server in the county in which service was effected. I am over the age of eighteen years and not a party to the action. I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

Our Reference Number: 214151
Client Reference: Evan S. Mortimer

Friday, July 19, 2024

**TRI-COUNTY PROCESS SERVING LLC**
P.O. Box 1224
Boise, ID, 83701
(208) 344-4132

ELAINA TENINTY

## TRI-COUNTY PROCESS SERVING L.L.C.

P.O. Box 1224
Boise, ID, 83701
(208) 344-4132 Business
(208) 338-1530 Fax
Federal Tax ID: 82-0348092

# Invoice #214151

## Attn: Evan S. Mortimer

LITSTER FROST INJURY LAWYERS
3501 W. ELDER ST., STE. 208
BOISE ID 83705
208-489-6400 Business
208-489-6404 Fax

--------<

### Reference Job #214151 when remitting.

Brandon W. Schaapman vs Wright Medical Technology, Inc.
**Case Number: CV01-24-06207**
**Attn: Evan S. Mortimer**
**Documents: Summons; Complaint for Damages and Jury Trial Demand; Plaintiff's First Set of Interrogatories to Defendant Microport Orthopedics Inc.; Plaintiff's First Requests for Production of Documents to Defendant Microport Orthopedics Inc.**

**Service Upon: Microport Orthopedics, Inc.**

Completed on July 17, 2024 at 11:07 AM,
at: Microport Orthopedics, Inc., 1555 W. Shoreline Dr., Ste. 100, Boise, ID 83702
by Elaina Teninty

Mileage Fee $13.30
Copy Fee 119 *pages at* $0.30 *per page* $35.70
Service Fee $56.00

Total: $105.00

## DUE ON RECEIPT: $105.00

Thank You for Choosing
**Tri-County Process Serving LLC**!